# IN THE UNITED STATES COURT OF INTERNATIONAL TRADE

| | |
|---|---|
| CHAPTER1 LLC, on behalf of itself and all others similarly situated, | )<br>)<br>)<br>) |
| Plaintiffs, | ) Case No. 25-cv-0097 |
| v. | ) PROPOSED CLASS ACTION |
| THE UNITED STATES, | ) |
| Defendant. | ) |

**COMPLAINT**

1.      Almost immediately upon taking office, President Trump imposed tariffs by executive order citing the International Emergency Economic Powers Act (IEEPA) as a source of purported authority. For instance, Executive Order 14257, issued on April 2, 2025 declared a national emergency and imposed an "*ad valorem* duty on all imports from all trading partners . . . start[ing] at 10 percent . . ." and increasing for each country by a percentage equal to the quotient of the U.S. trade deficit with that country and the value of U.S. imports from that country divided by two. On April 9, the President issued a 90-day pause on the additional quotient-based tariffs for all nations other than China and left the 10% worldwide tariff in effect. Collectively these orders are referred to as the "Challenged Tariff Orders."

2.      The upshot of these orders is that goods from anywhere in the world are subject to a duty of at least 10% and goods from China are subject to a duty of at least 145%. U.S. importers have paid at least $13 billion in duties under these orders.

3.      Plaintiff Chapter1 LLC is one such U.S. importer. On May 5, 2025, Chapter 1, a small skincare start-up, imported a piece of machinery from China for its business manufacturing skincare products in the U.S. for sale in the U.S. The machine cost Chapter 1 $15,830. But Chapter1 paid $26,911.00 in duties, $22,953.50 of which is directly attributable to the Challenged Tariff Orders.

4.      This Court declared the Challenged Tariff Orders unconstitutional on May 28, 2025. Thus, Chapter1 brings this Action, on behalf of itself and all others similarly situated, against Defendant the United States to recover the tariffs paid under the Challenged Tariff Orders.

## Parties

5.     Plaintiff Chapter1 LLC is a limited-liability company organized under Nevada law and headquartered in Las Vegas. Chapter1 is a start-up skincare company. It is solely owned by Ali Shaubzada, a 25-year-old U.S. citizen. On May 5, 2025, Chapter1 paid $26,911.00 in duties to import a custom-made machine that cost $15,830. Chapter1 sues on its own behalf and behalf of all other similarly situated.

6.     Defendant the United States of America has waived sovereign immunity for suits brought to recover duties illegally exacted by federal agencies in 28 U.S.C. § 1581(i).

## Jurisdiction and Venue

7.     This Court has exclusive subject-matter jurisdiction over this Action under 28 U.S.C. § 1581(i)(1)(A), (B) and (C) because it is brought against the United States and "arises out of a[] law of the United States providing for . . . embargoes or other quantitative restrictions of the importation of merchandise for reasons other than the protection of the public health or safety," "arises out of a[] law of the United States" that has been improperly invoked to "provid[e] for . . . tariffs [and] duties . . . for reasons other than the raising of revenue," and also "arises out of a[] law of the United States providing for revenue from imports." *See V.O.S. Selections, Inc. v. United States*, No. 25-00066, 2025 WL 1514124, at *7–*8 (C.I.T., May 28, 2025).

8.     This Court may exercise personal jurisdiction over the United States because it is at home in any federal court.

2

**The President Invokes Emergency Powers to Impose Tariffs in Response to Trade Deficits**

9. As this Court stated in an opinion on May 28, 2025, *see V.O.S. Selections v. Trump*, No. 25-cv-66, Dkt. No. 55, pages 10–15:

10. "On the date of his inauguration, [the President] issued Executive Order 14157, declaring a national emergency under IEEPA to deal with the threats posed by international cartels that 'have engaged in a campaign of violence and terror throughout the Western Hemisphere that has not only destabilized countries with significant importance for our national interests but also flooded the United States with deadly drugs, violent criminals, and vicious gangs.' Executive Order 14157, *Designating Cartels and Other Organizations as Foreign Terrorist Organizations and Specially Designated Global Terrorists*, 90 Fed. Reg. 8439, 8439 (Jan. 20, 2025). The President issued Proclamation 10886 on the same day, declaring a national emergency at the southern border caused by 'cartels, criminal gangs, known terrorists, human traffickers, smugglers, unvetted military-age males from foreign adversaries, and illicit narcotics that harm Americans.' Proclamation 10886, *Declaring a National Emergency at the Southern Border of the United States*, 90 Fed. Reg. 8327, 8327 (Jan. 20, 2025)."

11. "Shortly thereafter, the President expanded the national emergency 'to cover the threat to the safety and security of Americans, including the public health crisis of deaths due to the use of fentanyl and other illicit drugs, and the failure of Canada to do more to arrest, seize, detain, or otherwise intercept [drug trafficking organizations], other drug and human traffickers, criminals at large, and drugs.'

Executive Order 14193, *Imposing Duties to Address the Flow of Illicit Drugs Across Our Northern Border*, 90 Fed. Reg. 9113, 9114 (Feb. 1, 2025) ('Canada Tariff Order'). Similarly, the President expanded the national emergency 'to cover the failure of the [People's Republic of China] government to arrest, seize, detain, or otherwise intercept chemical precursor suppliers, money launderers, other [transnational criminal organizations], criminals at large, and drugs.' Executive Order 14195, *Imposing Duties to Address the Synthetic Opioid Supply Chain in the People's Republic of China*, 90 Fed. Reg. 9121, 9122 (Feb. 1, 2025) ('China Tariff Order')."

12.   "In response to these emergencies, the President imposed 25 percent *ad valorem* duties on articles that are products of Canada and Mexico, *see* Executive Order 14193, 90 Fed. Reg. at 9114; Executive Order 14194, Imposing Duties to Address the Situation at Our Southern Border, 90 Fed. Reg. 9117, 9118 (Feb. 1, 2025) ("Mexico Tariff Order"), and a 10 percent *ad valorem* duty on articles that are the products of China, *see* Executive Order 14195, 90 Fed. Reg. at 9122. The President imposed a lower 10 percent *ad valorem* rate on energy and energy resources from Canada. *See* Executive Order 14193, 90 Fed. Reg. at 9114. These duties were to take effect on February 4, 2025. *See id.* The President later raised the trafficking tariffs on Chinese products from 10 percent to 20 percent. *See* Executive Order 14228, *Further Amendment to Duties Addressing the Synthetic Opioid Supply Chain in the People's Republic of China*, 90 Fed. Reg. 11463, 11463 (Mar. 3, 2025)."

13.   "On February 3, shortly after imposing the trafficking tariffs, the President issued two additional executive orders, finding that the governments of

4

Mexico and Canada 'ha[ve] taken immediate steps designed to alleviate the illegal migration and illicit drug crisis through cooperative actions.' Executive Order 14198, *Progress on the Situation at Our Southern Border*, 90 Fed. Reg. 9185, 9185 (Feb. 3, 2025); Executive Order 14197, *Progress on the Situation at Our Northern Border*, 90 Fed. Reg. 9183, 9183 (Feb. 3, 2025). As a result, the President imposed a pause on the 25 percent duties on Mexican and Canadian products and on the 10 percent duties on Canadian energy and energy resources, moving the effective date of those duties to March 4, 2025. *See id.*"

14. "Since the trafficking tariffs took effect on February 4 for China and March 4 for Canada and Mexico, the President has modified the rates further. The President lowered the duty rate for potash 1 from Canada and Mexico to 10 percent. *See* Executive Order 14231, *Amendment to Duties To Address the Flow of Illicit Drugs Across Our Northern Border*, 90 Fed. Reg. 11785, 11785 (Mar. 6, 2025); Executive Order 14232, *Amendment to Duties To Address the Flow of Illicit Drugs Across Our Southern Border*, 90 Fed. Reg. 11787, 11787 (Mar. 6, 2025). Additionally, the President implemented duty-free *de minimis* treatment for otherwise eligible covered articles. *See* Executive Order 14226, *Amendment to Duties to Address the Flow of Illicit Drugs Across Our Northern Border*, 90 Fed. Reg. 11369, 11369 (Mar. 2, 2025); Executive Order 14227, *Amendment to Duties to Address the Situation at Our Southern Border*, 90 Fed. Reg. 11371, 11371 (Mar. 2, 2025); Executive Order 14200, *Amendment to Duties Addressing the Synthetic Opioid Supply Chain in the People's Republic of China*, 90 Fed. Reg. 9277, 9277 (Feb. 5, 2025). The President later

5

removed this duty-free de minimis treatment for Chinese products. See Executive Order 14256, *Further Amendment to Duties Addressing the Synthetic Opioid Supply Chain in the People's Republic of China as Applied to Low-Value Imports*, 90 Fed. Reg. 14899, 14899 (Apr. 2, 2025)."

15. "Currently, the trafficking tariffs all remain in place, set at 25 percent for Mexican and Canadian products and at 20 percent for Chinese products. The tariffs on Canadian energy and energy resources remain at the lower 10 percent rate. . . ."

16. "On April 2, 2025, the President issued Executive Order 14257, invoking IEEPA to impose a general 10 percent *ad valorem* duty on 'all imports from all trading partners,' which 'shall increase for' a list of 57 countries to higher rates ranging from 11 percent to as high as 50 percent ad valorem. Executive Order 14257, *Regulating Imports With a Reciprocal Tariff to Rectify Trade Practices That Contribute to Large and Persistent Annual United States Goods Trade Deficits*, 90 Fed. Reg. 15041, 15045 (Apr. 2, 2025). The President imposed these tariffs in response to a national emergency with respect to 'underlying conditions, including a lack of reciprocity in our bilateral trade relationships, disparate tariff rates and non-tariff barriers, and U.S. trading partners' economic policies that suppress domestic wages and consumption, as indicated by large and persistent annual U.S. goods trade deficits.' *Id.* at 15041. The President stated that these 'large and persistent annual U.S. goods trade deficits' constitute an 'unusual and extraordinary threat to the national security and economy of the United States,' having 'its source in whole or substantial

part outside the United States in the domestic economic policies of key trading partners and structural imbalances in the global trading system.' *Id.* On April 9, 2025, the President issued another Executive Order that paused, for all countries but China, the implementation of the higher country-specific tariffs for 90 days, moving their effective date to July 9, 2025. *See* Executive Order 14266, *Modifying Reciprocal Tariff Rates to Reflect Trading Partner Retaliation and Alignment*, 90 Fed. Reg. 15625, 15626 (Apr. 9, 2025)."

17. "As China responded to the various country-specific tariff adjustments by adjusting its own tariff rates on U.S. goods, the President has amended the duty rate on Chinese goods several times in retaliation. The President first increased the China-specific duty rate from 34 to 84 percent effective April 8, *see* Executive Order 14259, *Amendment to Reciprocal Tariffs and Updated Duties as Applied to Low-Value Imports From the People's Republic of China*, 90 Fed. Reg. 15509, 15509 (Apr. 8, 2025), and then from 84 to 125 percent effective April 10, 2025, *see* Executive Order 14266, 90 Fed. Reg. at 15626."

18. "Currently, the worldwide tariffs remain in place at 10 percent for all countries, while the country-specific higher rates are set to take effect on July 9, 2025. The China-specific rate is now also at 10 percent after President Trump lowered the 125 percent retaliatory tariffs in response to China, taking 'a significant step . . . toward remedying non-reciprocal trade arrangements and addressing the concerns of the United States relating to economic and national security matters.' Executive Order 14298, *Modifying Reciprocal Tariff Rates To Reflect Discussions With the*

*People's Republic of China*, 90 Fed. Reg. 21831, 21831 (May 12, 2025). This lower rate is effective until August 12, 2025. *See id*. All of these tariffs, including the modifications listed here, are hereafter referred to as the 'Worldwide and Retaliatory Tariffs.'"

19. As this Court did in its opinion and judgment, this Complaint will refer to all the Orders mentioned there and that purport to enact tariffs pursuant to IEEPA as the "Challenged Tariff Orders."

## Chapter1 Pays Tariffs and Risks Bankruptcy

20. Ali Shaubzada, Chapter1's sole owner, grew up watching his father operate and grow a small business that contributed to his community. Shaubzada wants to do the same with Chapter1.

21. Shaubzada struggled with acne for much of his life. He spent thousands of dollars on skincare products recommended to him, but none worked. Through trial and error, Ali discovered that popular skin products didn't work because they were bloated with extra, unnecessary ingredients that irritated his skin. Worse yet, he learned that many of these filler ingredients are also environmentally harmful.

22. Unable to find clean, minimally processed skincare products, Shaubzada set out to make such a product himself.

23. After pouring much of his life savings, business loans, and time into finding the perfect formulation, Shaubzada made two products—a toner and a serum—that are minimally processed and effectively soothed his skin.

24. Shaubzada wants to sell these clean and environmentally friendly products in America.

25. To produce skincare products at scale, Chapter1 needs a machine to mix and bottle its serum and toner products. The machine needs to be built to precise specifications and with material that would not irritate customers' skin.

26. Shaubzada could find no such machine in America.

27. Accordingly, in September 2024, Chapter1 agreed to buy a custom-made machine from Hunan Migrand Machinery Technology Co., Ltd ("HMMT"), a Chinese company. The machine cost $15,830.

28. To pay for the machine, Shaubzada used most of what was left of his life savings and business lines of credit.

29. HMMT took several months to make Chapter1's custom machine.

30. As Shaubzada waited for HMMT to produce the machine, he began working on other parts of Chapter1's business. He designed a logo, set up a website, and sketched out a business plan that would result in his products one day being sold in major retailers around America.

31. On March 23, HMMT told Ali that it had finished manufacturing the machine.

32. On March 31, HMMT delivered the machine to the Port of Shanghai.

33. Per Chapter1's contract with HMMT, title passed to Chapter1 when HMMT delivered the machine to the Port of Shanghai.

34. When Chapter1's machine was at port, the President issued Executive Order 14257, imposing a 34% tariff on Chinese imports to apply to goods shipped after April 5. On April 8, President increased the rate of tariffs on goods imported

from China through Executive Order 14259, which increased the tariff imposed on Chinese imports in Executive Order 14257 to 84%. One day later, President Trump issued Executive Order 14266, increasing the rate announced in Executive Order 14257 further to 125%. On top of the 20% tariff rate previously issued under Executive Order 14195, as amended by Executive Order 14228, Chapter1 faced a 145% rate because of the most recent executive orders.

35. Chapter1's machine was delayed at the port of Shanghai and did not ship until April 7. It arrived in the United States on May 5, 2025. Chapter1 thus had to pay $26,911.00 in duties, $22,953.50 of which were attributable to the Challenged Tarrif Orders.

36. To pay for this unexpectedly large bill, Ali had to take out a personal loan.

### This Court Holds The Duties Unconstitutional

37. On May 28, 2025, this Court issued an opinion in 25-66, *V.O.S. Selections v. Trump*, holding all of the relevant tariffs unconstitutional. In an accompanying judgment, this Court "ORDERED that Executive Order 14193, *Imposing Duties To Address the Flow of Illicit Drugs Across Our Northern Border*, 90 Fed. Reg. 9113 (Feb. 1, 2025); Executive Order 14194, *Imposing Duties To Address the Situation at Our Southern Border*, 90 Fed. Reg. 9117 (Feb. 1, 2025); *Executive Order 14195, Imposing Duties To Address the Synthetic Opioid Supply Chain in the People's Republic of China*, 90 Fed. Reg. 9121 (Feb. 1, 2025); Executive Order 14257, *Regulating Imports with a Reciprocal Tariff to Rectify Trade Practices that Contribute to Large and Persistent Annual United States Goods Trade Deficits*, 90 Fed. Reg.

10

15041 (Apr. 2, 2025) (collectively, the 'Challenged Tariff Orders'); and all modifications and amendments thereto; be, and hereby are, declared to be invalid as contrary to law." *V.O.S. Selections*, Dkt. No. 56. It accordingly permanently enjoined the collection of duties pursuant to any of those orders.

## Class Action Allegations

38. Chapter1 proposes to move to certify the following class: All people who paid or will pay tariffs under IEEPA imposed by the Challenged Tariff Orders.

39. The proposed class meets the requirements of Court of International Trade Rule 23, known respectively as numerosity, commonality, typicality, adequacy, predominance, and superiority.

40. The class is so large that joinder of all parties would be impracticable. There are hundreds of thousands, perhaps millions, of people who imported goods into the United States since the Challenged Tariff Orders went into effect.

41. There are questions of law and fact common to members of the class and subclass. The common questions of fact include, without limitation, whether trade deficits with other countries are "unusual" or "extraordinary" within the meaning of IEEPA. The common questions of law include, without limitation, whether IEEPA authorizes the imposition of tariffs at all; and whether, if IEEPA does authorize tariffs in response to an emergency within the President's unreviewable discretion to declare that law is unconstitutional.

42. Chapter1's claims are typical of, indeed identical to, those of the class. Chapter1 paid tariffs pursuant to the Challenged Tariff Orders. Its claims are thus typical of those of the class.

11

43. Chapter1 will adequately protect the interests of the class. It has no known conflicts of interest with other members of the class and its claims, as explained above, are identical to those of the class. Class counsel will further adequately protect the interests of the class.

44. Questions of fact and law common to the class predominate in this action over any questions affecting only individual members of the class, and a class action is a superior—indeed the only practicable—way to administer this Action. Every member of the class has an identical claim to every other; the only relevant difference between the members of each class is how much each paid in tariffs, which is easily calculable from records maintained by CBP.

## Claim for Relief

### *Count One*: Repayment of Illegally Exacted Tariffs For All Goods (on behalf of Chapter1 and the Class as a whole)

45. Plaintiff incorporates all prior paragraphs by reference here.

46. On May 5, 2025, Chapter1, acting through an agent, paid $26,911 in tariffs to import $15,830 worth of goods from China.

47. Of those duties, $22,953.50 is attributable to the Challenged Tariff Orders.

48. IEEPA does not authorize the imposition of tariffs at all. IEEPA, in relevant part, empowers the President to "regulate . . . importation or exportation of . . . any property in which any foreign country or national thereof has any interest . . . ." IEEPA's reference to "regulat[ing]" imports does not refer to tariffs, which are explicitly provided for in other sections of federal law.

12

49. In the alternative or additionally, the situation described in the Challenged Tariff Orders is not an "emergency" under IEEPA. It is neither "extraordinary" nor "unusual" because it has been ongoing since at least the 1970's.

50. In the alternative or additionally, the situation described is not an "emergency" under IEEPA because it is not a "threat"; trade deficits, in and of themselves, are not necessarily harmful.

51. In the alternative, if IEEPA grants the President the power to impose tariffs of any rate, on any goods, at any time, from any country, and for any reason that he declares to be an "emergency" in his sole and unreviewable discretion, IEEPA is an unconstitutional delegation of legislative authority to the President.

52. In the alternative or additionally, the tariffs imposed do not "deal with" any of the threats identified.

53. This Court held that the tariffs in the Challenged Tariff Orders were indeed illegally imposed.

54. Because the tariffs were not authorized by federal law, the amounts paid pursuant to them were illegally exacted and a money judgment in that amount should issue against the United States.

## Prayer for Relief

Plaintiff Chapter1 LLC respectfully requests:

- A money judgment against the United States in favor of Chapter1 in the amount of all tariffs paid by Chapter1 LLC pursuant to the illegal Challenged Tariff Orders, which is $22,953.50;
- An order certifying the class defined above;
- A money judgment in favor of the Class against the United States in the amount of all tariffs paid pursuant to the illegal Challenged Tariff Orders;

- In the alternative, an injunction requiring a refund of all tariffs paid pursuant to the illegal Challenged Tariff Orders;
- Interest available by statute or rule;
- Costs and fees available by statute or rule; and
- All other relief this Court deems just and proper.

Respectfully submitted,

*/s/ Charles Gerstein*
Charles Gerstein
Jeremy Shur
(*pro hac vice* application forthcoming)
GERSTEIN HARROW LLP
400 7th Street NW, Suite 304
Washington, DC 20025
charlie@gerstein-harrow.com
(202) 670-4809

Jason Harrow
(*pro hac vice* application forthcoming)
GERSTEIN HARROW LLP
12100 Wilshire Blvd. Suite 800
Los Angeles, CA 90025
jason@gerstein-harrow.com
(323) 744-5293

*Attorneys for Plaintiffs*